# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

BRYCE CHEROY CAMPBELL,

      Plaintiff,

      v.

PFC THOMAS SIMS, *in his official and
individual capacities*,
OTHER UNKNOWN OFFICERS OF THE
TAKOMA PARK POLICE DEPARTMENT
and
CITY OF TAKOMA PARK,

      Defendants.

Civil Action No. TDC-20-2590

## MEMORANDUM OPINION

Plaintiff Bryce Cheroy Campbell filed suit against Defendants PFC Thomas Sims ("Officer Sims"), sued in his official and individual capacities, Other Unknown Officers of the Takoma Park Police Department ("the John Doe Officers"), and the City of Takoma Park ("Takoma Park") in the Circuit Court of Montgomery County, Maryland asserting federal and state constitutional claims and state tort claims stemming from his seizure for purposes of an emergency mental health examination on April 8, 2017 and his subsequent involuntary commitment. Campbell also named as Defendants Montgomery County, Maryland; Prince George's County, Maryland; and the Takoma Park Police Department but has since dismissed his claims against them.

Takoma Park, joined by Officer Sims in his official capacity, has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Takoma Park's Motion"). In his individual capacity, Officer Sims has filed a Motion for Summary Judgment ("Officer Sims's Motion"). Campbell opposes both Motions. Having reviewed the briefs and submitted materials,

the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Takoma Park's Motion will be GRANTED IN PART and DENIED IN PART, and Officer Sims's Motion will be DENIED.

**BACKGROUND**

**I.      The Complaint**

On April 8, 2017, Campbell was taken to the emergency department of Washington Adventist Hospital in Takoma Park, Maryland by his mother and uncle for a mental health evaluation. Campbell was evaluated and determined not to be a candidate for involuntary admission, so he was discharged. Campbell's family wanted to take him to another emergency room for evaluation, but Campbell refused and went to the hospital lobby to wait for a friend who was coming to pick him up. In response to Campbell's refusal, someone placed a call to 911, to which officers from the Takoma Park Police Department, including Officer Sims, responded. Officer Sims, accompanied by other officers, approached Campbell in the hospital lobby and asked him several questions to which, Campbell asserts, he responded in a reasonable and coherent manner.

Campbell alleges that the officers nevertheless physically restrained him, threw him to the ground, and forcibly and against his will brought him back to the emergency department for a second mental health evaluation. Campbell, frustrated, began asking the officers what authority they had to force him back to the emergency department from which he had just been discharged. In response, the officers again restrained Campbell, including by aiding hospital staff in putting him in four-point restraints and forcefully catheterizing him, actions that Campbell alleges were undertaken without legal justification. After a second mental health evaluation, Campbell was involuntarily admitted to the hospital.

2

Campbell asserts that in order to justify having the emergency department conduct the second mental health evaluation, Officer Sims falsified parts of a "Petition for Emergency Evaluation" ("the Petition") and failed to properly complete the required accompanying "Certification by Peace Officer" ("the Certification"). The Petition, which was attached to the Complaint, contains a section to list the behavior prompting the petitioner to conclude that the individual for whom an evaluation was sought "has a mental disorder." Pet. at 1, Compl. Ex. 5, ECF No. 4-1. In that section, Officer Sims wrote: "Ran down Carroll Avenue into moving traffic [and] hiding in between cars / Evaluee advised that God was talking to him telling to stay in the hospital lobby because it was safe / It had cameras." *Id.* The Petition also contained a section to list the reasons that the "Evaluee presents a danger to the life or safety of the Evaluee or others," but that section was left blank. *Id.* The accompanying Certification contains checkboxes requiring the certifying officer to mark whether the officer had personally observed the "Evaluee" or the "Evaluee's behavior," and to mark whether the certifying officer was relying on "observation" or "other information" in concluding that the Evaluee had "a mental disorder and presents a danger to life or safety of the Evaluee or others." Certification, Compl. Ex. 5, ECF No. 4-1. Officer Sims did not mark any of the checkboxes. *Id.*

## II.     Additional Facts

Officer Sims, in his Motion for Summary Judgment, has submitted additional evidence including his affidavit, records relating to police communications during the incident, and body camera video footage relating to the detention of Campbell. This additional evidence reflects that prior to detaining Campbell, the officers had received some reports from his family members that he was having a mental health episode and that he was not eating. On April 8, 2017, the day of Campbell's seizure, Officer Sims and other officers engaged with Campbell at Washington

3

Adventist Hospital but found no reason to detain him for a mental health evaluation. Campbell was then evaluated by mental health professionals at the hospital and was released rather than involuntarily detained. After Campbell's mother and uncle attempted to get him into a car to take him to another hospital for another evaluation, he broke away from them, apparently ran into the street, then returned to the hospital and sat in its lobby.

The officers were again summoned. Officer Sims, Acting Sergeant Kristian Pederson ("Sgt. Pederson") and others questioned Campbell, who denied that he intended to hurt himself or others. He explained that after he refused to go with his relatives to another hospital, his uncle forcibly sought to move him into a car, which caused Campbell to flee, but Campbell then returned to the hospital lobby to await a ride from a friend he knew from the University of Maryland. He was resolved to stay there because with security cameras there, he would be safe from another attempt by his uncle to remove him.

On several occasions, Campbell referred to hearing God speak to him, including by telling him to stay in the hospital lobby because it was safe. Sgt. Pederson asked him if God was telling him to hurt himself or anyone else, but Campbell denied hearing any such directions. Based on the body camera video, Campbell remained generally calm in responding to the officers' questions, and though he avoided answering questions that would identify his friend or the type of vehicle the friend was driving, he was generally cooperative with the officers.

After another consultation with Campbell's relatives, Sgt. Pederson decided that there was enough information to detain Campbell based on a Petition for an Emergency Evaluation. He told Campbell that they were going to take him back to the emergency room and asked for but did not receive voluntary cooperation. Campbell protested that "I haven't done anything to anyone" and stated that he had already been evaluated already. Officer Sims Mot. Summ. J. Ex. 6 (body camera

4

footage). Sgt. Pederson, Officer Sims, and another officer then seized Campbell, put him on the ground, handcuffed him, and took him back to the emergency room. He remained restrained as medical personnel evaluated him. Before and during the seizure, Campbell screamed out and repeated several statements, including, "I'd like to stay here," "Why are you doing this to me?," "Please, stop," "I'm not a danger to anyone," and "I'm not fighting you." *Id.*

### III. Procedural History

On April 3, 2020, Campbell filed suit in the Circuit Court for Montgomery County, Maryland. The Complaint presently alleges against the remaining Defendants—Officer Sims, the John Doe Officers, and Takoma Park—12 causes of action. Campbell's claims are asserted against all Defendants unless otherwise specified, in numbered counts as follows: (1) a violation of Article 24 of the Maryland Declaration of Rights, which imposes due process requirements, based on alleged falsehoods in the Petition; (2) a violation of Article 26 of the Maryland Declaration of Rights, which imposes a warrant requirement for searches or seizures; (3) false arrest and false imprisonment; (4) a second Article 24 claim alleging that Campbell was subjected to an unlawful seizure without probable cause or other legal justification; (5) intentional infliction of emotional distress; (6) battery; (7) negligence; (8) gross negligence; (9) negligent hiring, training, supervision, and retention, as to Takoma Park only; (10) civil conspiracy; (11) a claim under 42 U.S.C. § 1983 ("§ 1983") for a violation of his rights under the Fourth and Fourteenth Amendment to the United States Constitution; and (12) a § 1983 claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), as to Takoma Park only. On September 8, 2020, Defendants removed the case to this Court.

On October 15, 2020, the Court issued an Order memorializing deadlines agreed upon by the parties at a Case Management Conference held earlier that same day. In that Order, the Court

set a deadline of October 29, 2020 for Campbell to file an Amended Complaint. Campbell failed to meet that deadline and filed an Amended Complaint on October 30, 2020. On November 2, 2020, the Clerk of Court disabled the filing because it failed to conform with Local Rule 106(c), which requires that filings of amended pleadings include both a clean copy and a red-line copy of the amended pleading, and notified Campbell that he had to refile his Amended Complaint in a manner complying with the Local Rule. Campbell did not do so. The original Complaint, ECF No. 4, thus remains the operative pleading. Nevertheless, as a matter of efficiency, the Court will consider the limited, additional facts asserted in the Amended Complaint.

## DISCUSSION

### I. Takoma Park's Motion to Dismiss

In Takoma Park's Motion, Takoma Park and Officer Sims, in his official capacity, seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, Takoma Park seeks dismissal of Counts 3 and 5–10 of the Complaint on the basis that, as a local government, it is immune from suit for non-constitutional torts. Takoma Park seeks dismissal of Count 11 on the basis that there is no vicarious liability for § 1983 claims, and it seeks dismissal of Count 12, the *Monell* claim, on the basis that Campbell has failed adequately to plead a municipal custom or policy of constitutional violations. Officer Sims seeks dismissal of the claims against him in his official capacity on the basis that they are duplicative of the claims against Takoma Park.

### A. Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## B.    Official Capacity Claims

As a threshold issue, Officer Sims correctly asserts that the claims against him in his official capacity are duplicative of the claims against Takoma Park and are therefore subject to dismissal. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (stating that suits against government officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent" (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978))); *cf. Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (dismissing a 42 U.S.C. § 1983 official capacity claim against a school superintendent as duplicative of a claim against the school board). All counts against Officer Sims in his official capacity will therefore be dismissed.

## C.    Sovereign Immunity

Takoma Park invokes sovereign immunity as a basis for dismissal of the various non-constitutional torts asserted in Counts 3 and 5–10 of the Complaint. In Maryland, counties and municipalities, as instrumentalities of the State, are immune from suit for common law, non-constitutional torts that stem from the exercise of a governmental, rather than proprietary, function. *Bd. of Educ. of Prince George's Cty. v. Town of Riverdale*, 578 A.2d 207, 210 (Md. 1990). A function is governmental if it is "performed ... for the common good of all" rather than "for the special benefit or profit" of the local government. *Tadjer v. Montgomery Cty.*, 479 A.2d 1321,

1325 (Md. 1984). The "exercise of the police power to promote the safety, health, and welfare of the public" is a quintessential government function. *E. Eyring and Sons Co. v. City of Balt.*, 252 A.2d 824, 826 (Md. 1969); *see also Town of Port Deposit v. Petetit*, 688 A.2d 54, 64 (Md. Ct. Spec. App. 1997) (holding that acts taken by a Chief of Police pursuant to his law enforcement authority were "clearly" an exercise of a government function). Here, Campbell has sued Takoma Park based on being seized by police officers in response to a 911 call, an act that plainly falls within the scope of the police power. Because Campbell's state common law, non-constitutional tort claims against Takoma Park arise from the exercise of a government function, Takoma Park is immune from suit on those claims.

Although Campbell argues that dismissal of the state common law tort claims on the basis of sovereign immunity is premature because he requires discovery on this issue, he has not identified a dispute of fact relevant to this issue that would necessitate discovery. *Cf. Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (noting in the context of the Foreign Sovereign Immunities Act that discovery on the issue of immunity "should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination"). The Court will therefore dismiss Counts 3 and 5–10 as to Takoma Park. Because Count 9 is alleged against only Takoma Park, it will be dismissed entirely.

**D.    42 U.S.C. § 1983**

Campbell asserts two claims under § 1983. Count 11, alleged against both Officer Sims and Takoma Park, asserts that the seizure of Campbell violated his Fourth and Fourteenth Amendment rights. Based on the substance of Campbell's factual allegations, it appears his claim has two components: a challenge to the legality of his seizure and a challenge to the level of force

8

used to effect that seizure. Count 12, alleged against Takoma Park only, is a claim that Takoma Park is liable under *Monell* based on a custom and policy of constitutional violations.

Takoma Park seeks dismissal of Count 11 on the basis that the Complaint contains no facts that would render Takoma Park directly liable for any constitutional injuries and instead proceeds on a theory of *respondeat superior*, or vicarious liability, which is not a viable form of liability for § 1983 claims. Takoma Park is correct. There is no vicarious liability for § 1983 claims. *Love-Lane*, 355 F.3d at 782. Count 11 will be dismissed as to Takoma Park.

Takoma Park can therefore be liable to Campbell under § 1983 only through Count 12, which alleges that Takoma Park is liable for the actions of Officer Sims because it had a custom, policy, or practice that led to Campbell's alleged constitutional injuries. *See Monell*, 436 U.S. at 691 (holding that municipalities can be liable under § 1983 only if "action pursuant to official municipal policy of some nature caused a constitutional tort"). Takoma Park challenges the sufficiency of Campbell's allegations on that score, asserting that they do not support a viable claim. The Court agrees.

In Count 12, Campbell asserts that Takoma Park "failed to adequately train, supervise, and discipline its law enforcement officers against committing" the alleged constitutional violations, that it has "instituted and maintained formal and informal customs, policies, and practices that foster, promote and encourage officers to engage in excessive confinement and arrest without probable cause, [the] filing of false charges, and excessive force against citizens," that there has been a "regular pattern and practice of identical behavior within the police force," that Takoma Park has "failed to effectively instruct officers" to avoid committing violations, and that Takoma Park has "no meaningful system to control and monitor the recurrence" of these alleged violations. Compl. ¶¶ 162–66, ECF No. 4. Campbell sets forth no facts in support of these allegations. He

9

cites no similar incidents, identifies no relevant policies, articulates no particular failings in the training of officers, and specifies no connection between the actions taken by the officers here and any overarching customs, practices, or policies of Takoma Park.

Campbell's factual allegations as to Takoma Park's role in depriving him of his federal constitutional rights thus consist of the "labels and conclusions" and "formulaic recitation of the elements of a cause of action" that the United States Supreme Court has deemed insufficient to state a plausible claim for relief under Federal Rule of Civil Procedure 8(a)(2). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Campbell points to nothing in either his own experience or Takoma Park's handling of Petitions for Emergency Evaluation more broadly that could serve as the factual basis for his *Monell* claim. *See Cook v. Howard*, 484 F. App'x 805, 811 (4th Cir. 2012) (affirming the district court's granting of a motion to dismiss the plaintiff's *Monell* claim where "the amended complaint parrots the language of various legal theories without stating any facts to demonstrate that type of conduct"); *Ulloa v. Prince George's Cty, Md.*, No. DKC 15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) (dismissing a *Monell* claim where the complaint failed to "pair general averments of a policy or custom with particular examples").

Consideration of the additional allegations in Campbell's untimely Amended Complaint, which was not formally accepted by the Court, does not alter this conclusion. The few additional allegations consist of more conclusory statements, such as the assertions that it was "apparent based on the officers' interactions" with Campbell that "Takoma Park had not properly trained them," that Takoma Park "created, instituted, and maintained, formal and informal customs, policies, and practices, that foster, promote and encourage officers to engage in conduct that is inappropriate when dealing with a person in a mental health crisis and that do not encourage de-escalation tactics and procedures," and that "Takoma Park has failed to implement and maintain

proper procedures and training for officers to respond appropriately to citizens experiencing mental health crises." Am. Compl. ¶¶ 31, 171-72, ECF No. 22. Having failed to provide specific facts supporting these conclusory assertions, Campbell has failed to state a viable *Monell* claim. Count 12 will be dismissed without prejudice, subject to renewal if discovery reveals facts that would support a finding of such a custom or policy.

### E.    Maryland Declaration of Rights

Takoma Park has not argued for dismissal of the claims under Article 24 and 26 of the Maryland Declaration of Rights and instead relies only on the summary judgment arguments asserted by Officer Sims in his Motion. Because, as discussed below, the Court will not grant summary judgment to Officer Sims on those counts based on those arguments, *see infra* part II.A, those counts remain against Takoma Park. *See DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999) ("We shall now dispel any doubt in the matter and make clear, as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.")

## II.    Officer Sims's Motion for Summary Judgment

In his individual capacity, Officer Sims has filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the

record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

With the Motion, Officer Sims has attached his own affidavit, a log of police communications relating to the incident, and body camera footage of the events. Although a party may move for summary judgment before the commencement of discovery, *see* Fed. R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson*, 477 U.S. at 250 n.5). The proper procedure for asserting a need for discovery before a summary judgment ruling is to file an affidavit pursuant to Rule 56(d) explaining why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* If a party does not submit a Rule 56(d) affidavit, the Court may still consider a request for discovery presented in the non-movant's memorandum of law opposing summary judgment. *Id.* at 244–45.

Here, Campbell has not filed a Rule 56(d) affidavit, but in his memorandum in opposition to the Motion, he requests discovery to more fully develop facts and uncover evidence about the April 8 incident. In the alternative, he argues that Officer Sims is not entitled to summary judgment because the evidence submitted with Officer Sims's Motion, particularly the body camera footage, itself establishes that the officers' conduct was unreasonable.

In some instances, undisputed video evidence may provide a sufficient basis upon which to grant summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, however,

summary judgment is not warranted at this time for two reasons. First, as discussed below, Officer Sims relies not only on the body camera videos, but also on his own affidavit and summary records of police communications, and all of this evidence includes references to relevant conversations and events that were not captured by the body camera videos, such as an earlier encounter between officers and Campbell at the hospital; the specific statements made by Campbell's relatives who sought police assistance; and the specific information provided to Sgt. Pederson on whether Campbell had been walking among cars moving in traffic. Notably, Sgt. Pederson, who ordered the seizure, has not submitted an affidavit and has not provided deposition testimony. Discovery on such events is necessary before the Court could fairly consider granting summary judgment against Campbell. *See* Fed. R. Civ. P. 56(d).

Second, even if the Court could fairly consider summary judgment based on the selective record submitted by Officer Sims, that evidence still would not justify granting summary judgment on behalf of Officer Sims. Although the Motion could be denied solely on the basis of the need to permit discovery, where Officer Sims seeks summary judgment on the basis of qualified immunity, an issue that should typically be addressed at an early stage of the case, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), and because consideration and resolution of Defendants' arguments based on the body camera videos may facilitate the advancement of this case to resolution, the Court will address those arguments.

A.    **Section 1983**

Officer Sims seeks summary judgment on the federal constitutional claim asserted under § 1983 in Count 11. Although in Count 11, Campbell alleges a violation of the Fourteenth Amendment while also mentioning the Fourth Amendment, the core of his claim is that he was unlawfully seized and detained by police officers for purposes of a mental health evaluation. His

claim is therefore most fairly construed as an alleged violation of the Fourth Amendment based on an unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (stating that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against ... physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide" for analyzing claims about the "'reasonableness' of a particular seizure"). Construed in this manner, Count 11 further divides into two challenges: the first to whether the seizure of Campbell for purposes of a mental health evaluation was lawful, and the second to whether that seizure was effected with excessive force. *See id.* (stating that the reasonableness of a particular seizure "depends not only on *when* it was made, but also on *how* it is carried out").

### 1. Qualified Immunity Standard

Officer Sims's primary argument relating to the § 1983 claim in Count 11 is that he is entitled to qualified immunity. Government officials sued in their individual capacities may invoke the protection of qualified immunity to bar a claim for civil damages under § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Henry v. Purnell*, 501 F.3d 374, 376-77 (4th Cir. 2007). When qualified immunity is asserted, a court must consider two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Henry*, 501 F.3d at 377. For qualified immunity to apply, only one of the questions has to be resolved in favor of the defendant. *See Henry*, 501 F.3d at 377. Courts may address the questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## 2.     Clearly Established Right

In determining whether a right is "clearly established," the Court considers whether "the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right" and was thus "on notice" that the conduct violated established law. *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018). Even if no court has found that the specific conduct in question violated an individual's rights, "if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question," the right may be clearly established. *Id.* However, "courts must not 'define clearly established law at a high level of generality.'" *Id.* (citations omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see White v. Pauly*, 137 S. Ct. 548, 552 (2017). The Court must "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552; *Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017). Although the facts of such a case need not be "identical" to the present facts, *Safar*, 859 F.3d at 248, it should be "obvious" that the case applies to the facts, *White*, 137 S. Ct. at 552.

In assessing this question, a court "first examines 'cases of controlling authority in [this] jurisdiction,'" here, the Supreme Court, the United States Court of Appeals for the Fourth Circuit, and the Court of Appeals of Maryland. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001)). If that authority is not dispositive, the Court may still consider "'a consensus of cases of persuasive authority' from other jurisdictions" as a basis to find that conduct was barred by clearly established law. *Id.* at 539 (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004)). When considering whether there is such a "consensus," a court considers not only the broad holdings of those cases

but also the specific requirements adopted by each court. *See Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004).

### a. Unreasonable Seizure

Turning first to the lawfulness of the seizure itself, the Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. In the context of an arrest for a criminal offense, an arrest is reasonable, with limited exceptions, only if supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 214 (1979). That seizures for purposes of mental health examinations also require probable cause has been clearly established. *Gooden v. Howard Cnty.*, 954 F.2d 960, 968 (4th Cir. 1992) ("We agree that the general right to be free from seizure unless probable cause exists was clearly established in the mental health seizure context."). In *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260 (4th Cir. 1998), the Fourth Circuit noted that as of its 1992 ruling in *Gooden*, in the context of seizures for purposes of mental health examinations, "it was arguably clearly established that an officer must have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual." *Id.* at 266. In both *Gooden* and *S.P.*, the court ultimately found that the defendant officers had qualified immunity to the plaintiffs' claims. *See Gooden*, 954 F.2d at 969, *S.P.*, 134 F.3d at 267–68.

In 2003, the Fourth Circuit clarified and solidified these principles in *Bailey v. Kennedy*, 349 F.3d 731, 740–41 (4th Cir. 2003). In *Bailey*, police officers had received a 911 call reporting that the plaintiff had been riding a bike while intoxicated, that he was depressed, and that he was going home to commit suicide. *Id.* at 734. A first officer entered the apartment; spoke to the plaintiff, who was eating lunch and denied that he was suicidal; learned that that the plaintiff's father had guns stored in a gun safe within the house but saw no weapons or signs of an impending

16

suicide attempt; and left when the plaintiff asked him to do so. *Id.* A second officer heard the first

officer say, "we're going to have to do something," then knocked on the door of the residence. *Id.*

at 735. Although the plaintiff denied that he was suicidal and said the idea was "crazy," said that

he was going to call his lawyer, and asked the officers to leave, the second officer forced his way

into the home, tackled the plaintiff, handcuffed him with the assistance of other officers, and

detained him for a mental health evaluation. *Id.*

The court ruled that where the officers "observed nothing that would indicate to them that

[the plaintiff] might be a danger to himself," the earlier "911 report cannot bear the weight" of

establishing probable cause, such that the seizure and detention of the plaintiff for a mental health

evaluation violated the Fourth Amendment. *Id.* at 740–41. In reaching this determination, the

Fourth Circuit emphasized the lack of observations by the officers on the scene to corroborate the

earlier reports that the plaintiff was suicidal and distinguished the facts from those in *Gooden*, in

which the officers heard screaming from the individual's apartment on two occasions, and in *S.P.*,

in which the individual was observed by the officers to be "distraught and crying" and "admitted"

to the officers that she had been contemplating suicide. *Id.* at 740 (*citing Gooden*, 954 F.2d at 962,

and *S.P.*, 134 F.3d at 267).

Based on the principles set forth in *Gooden* and *S.P.* and the Fourth Circuit's specific

holding in *Bailey* in 2003, the Court concludes that at the time of the events at issue in this case,

there was clearly established law that in order to effect a lawful seizure of an individual for

purposes of a mental health examination, law enforcement officers must have probable cause to

believe not only that the individual has a mental health condition, but that the individual posed a

danger to himself or others. *See S.P.*, 134 F.3d at 166; *Bailey*, 349 F.3d at 739 (*citing S.P.*).

Specifically, under *Bailey*, it was also clearly established that a report that an individual may pose

a danger to himself or others is not sufficient to establish probable cause if the officers, upon encountering the individual, do not see or hear anything that would indicate that the individual poses such a danger. *See Bailey*, 349 F.3d at 740–41.

### b.    Excessive Force

Turning to the claim that the officers used excessive force to effect the seizure, in *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court held that allegations of excessive force by law enforcement officers were to be analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395. "Both before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003). The Court thus finds that the right to be free of excessive force when being seized or detained was clearly established at the time of the events at issue.

### 3.    Violation of Constitutional Rights

Having determined that the rights at issue in the § 1983 claim were clearly established at the time of the events at issue, the Court turns to whether the allegations in the Complaint and the facts presently available, construed in the light most favorable to Campbell, are sufficient to support Campbell's claims that Officer Sims and the John Doe Officers violated one or both of those rights. *Saucier*, 533 U.S. at 201. As a threshold issue, Officer Sims argues that the decision to seize Campbell was made by Sgt. Pederson, based on information that Sgt. Pederson obtained outside of his presence; that he relied on Sgt. Pederson's conclusion that the officers had enough

information to submit a Petition for Emergency Evaluation; and that under the collective knowledge doctrine, he should not be held accountable for the seizure.

Under the collective knowledge doctrine as applicable here, "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself." *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011); *see United States v. Patiutka*, 804 F.3d 684, 691 (4th Cir. 2015) (stating that the collective knowledge doctrine allow a court to "substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer" when determining if there was probable cause). While this doctrine allows the Court to consider Sgt. Pederson's knowledge in assessing whether there was probable cause to support Officer Sims's actions taken at Sgt. Pederson's direction, Officer Sims has cited no authority to support the proposition that it absolves Officer Sims of liability even if Sgt. Pederson lacked sufficient facts to establish probable cause. The collective knowledge doctrine therefore does not provide a basis for summary judgment in favor of Officer Sims.

### a. Unreasonable Seizure

The Court turns first to whether the present facts, viewed in the light most favorable to Campbell, plausibly allege that Campbell was unreasonably seized for purposes of a mental health examination without probable cause, in violation of the Fourth Amendment. In the context of a detention or arrest, "the probable cause inquiry is informed by the contours of the offense at issue." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). The Court adopts an analogous approach here, undertaking the probable cause analysis in light of the governing statutory scheme.

Here, the officers sought to detain Campbell pursuant to a petition for emergency evaluation of an individual under Maryland law. Such a petition can be made "only if the petitioner

19

has reason to believe that the individual: (1) Has a mental disorder; and (2) Presents a danger to the life or safety of the individual or of others." Md. Code Ann., Health–Gen. § 10–622(a)(1)–(2) (West 2018). The statute further provides that a petition for emergency evaluation may be made by "[a] peace officer who personally has observed the individual or the individual's behavior." *Id.* § 10-622(b)(1)(ii). Subsequent involuntary commitment requires certification from a qualified medical professional establishing (1) that the individual has a diagnosis of a mental disorder; (2) that in the opinion of the medical professional, the individual needs inpatient care or treatment; and (3) that in the opinion of the medical professional, involuntary admission "is needed for the protection of the individual or another." *Id.* § 10-616(a)(2)(i)–(iii). Where the requirement of a reason to believe that the individual presents a danger to the life or safety of the individual or others largely tracks the constitutional requirement, *see supra* part II.A.2.a, the officers' actions can be fairly analyzed against the constitutional standard, with the additional requirement that the officer actually observed the individual or his behavior.

When considered together, the facts alleged in the Complaint, combined with the exhibits and body camera videos submitted, do not establish that the officers had probable cause to seize Campbell for a mental health evaluation. As in *Bailey*, the officers received reports from citizens that Campbell may have had a mental illness in that he was hearing voices and not eating, and at one point they learned that Campbell had run into traffic, possibly suggesting that he might present a danger to himself. The actual encounters between the officers and Campbell, however, did not appear to provide further evidence on the issue of dangerousness. As in *Bailey*, prior to the seizure there was an initial encounter between officers and Campbell during which Campbell "said or did nothing that caused us concern." Sims Aff. ¶ 3, Sims Mot. Summ. J. Ex. 1, ECF No. 27–3. Before the second encounter, Campbell was actually evaluated by medical staff and then released. In the

second encounter, as reflected in the body camera videos, Campbell was visibly calm, had no weapons, and did not say or do anything to present a physical threat to himself or others. Rather, he told officers that he was in the hospital lobby because his uncle had tried to force him into a car to go to another hospital for a second opinion, that he did not want to do so and thus ran away, and that he had come to the hospital lobby to wait for a friend to pick him up because it was a safe place, with security cameras, where his uncle could not attempt to seize him again. When viewed in the light most favorable to Campbell, this explanation put into context the report about Campbell running in the street and arguably conveyed that if Campbell did so on that occasion, it was not with the intention to hurt himself or others, and that he had no present intention to do so again—indeed, he repeatedly stated that he was in the hospital lobby because it was a safe place. Although Campbell acknowledged hearing God give him instructions and stated that God had told him to wait in the hospital lobby, that statement, which might suggest a mental disorder, included no threats or references to violence against himself or others, and if anything suggests that Campbell's primary concern was ensuring his own safety. *See* Md. Code Ann., Health–Gen. § 10-622(a)(1)– (2) (stating that a petition for emergency evaluation requires reason to believe both that the individual "[h]as a mental disorder, *and* [p]resents a danger to the life or safety of the individual or of others") (emphasis added). Notably, when asked directly if God was telling him to hurt himself or others, Campbell said no.

Thus, as in *Bailey*, based on the available evidence, the officers did not observe anything during their encounter with Campbell to establish that he presented a danger to himself or others. If anything, the facts in *Bailey* were more compelling, because in that case there was a report that the plaintiff was actually suicidal and there were guns present in the residence, and in the present case, at the time of the officers' seizure, Campbell had just been released from the emergency room

21

upon a determination by medical staff that he was not a candidate for involuntary commitment, a determination that involves an assessment of dangerousness. *See* Md. Code Ann., Health–Gen. § 10-616(a)(2)(iii) (stating that involuntary commitment requires an opinion that involuntary admission "is needed for the protection of the individual or another"). Although discovery may provide additional relevant facts, based on the evidence submitted by Officer Sims, there remains, at a minimum, a genuine issue of material fact on whether there was probable cause to seize Campbell for a mental health evaluation. Accordingly, and because it was clearly established at the time of this incident that individuals have a right to be free some seizure for a mental health evaluation absent probable cause that they present a danger to themselves or others, the Court finds that Officer Sims is not entitled to qualified immunity on the Fourth Amendment claim of an unreasonable seizure.

### b. Excessive Force

As for whether Officer Sims and his fellow officers used excessive force in violation of the Fourth Amendment to effect Campbell's seizure, the applicable standard is that of "objective reasonableness." *Graham,* 490 U.S. at 388. To determine whether a particular use of force was objectively reasonable, courts should ask whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. *See id.* at 396. Circumstances to consider include "whether the [individual] poses an immediate threat to the safety of the officers or others, and whether [the individual] is actively resisting." *Id.* When no criminal conduct is suspected, and the justification for the seizure "is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly *contrary* to the government's interest in initiating that seizure." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst,* 810 F.3d 892,

901 (4th Cir. 2016) (stating, in a case involving an individual seized for purposes of a mental health examination after he was "wandering into traffic," that the "justified degree of force is the degree reasonably calculated to prevent [the individual's] flight").

Here, Campbell's assertion that the officers "physically, violently, and against his will, threw [him] to the ground" and physically restrained him, Compl. ¶ 21, adequately alleges that the force used against him was excessive, particularly in light of his additional allegations that his demeanor throughout his initial interaction with the officers was calm and that he answered questions in a reasonable and coherent manner, facts corroborated by the body camera video. The video reflects that the three officers who detained Campbell, after asking but not receiving cooperation with the detention from Campbell, physically took to Campbell to the ground before handcuffing him, but they do not appear to have thrown him down or acted in a malicious way or with a gratuitous use of excessive force. The constitutional violation, if any, appears to be centered on the decision to detain Campbell more than the manner in which it was done. Nevertheless, where the Court will deny summary judgment on the unreasonable seizure claim, which will thus necessitate discovery, and it is not yet known what facts discovery will yield about any actions not visible on the videos or about the decisions to use handcuffs and to continue to restrain Campbell once he was brought to the emergency room again, as well as Campbell's allegation of forced catheterization, the Court finds that any grant of summary judgment on the excessive force claim would be premature. *Cf. Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1253 (10th Cir. 2013) (stating that in a civil action for damages, the question whether a defendant used excessive force, and the specific question whether the force used was reasonable, is a mixed question of law and fact properly submitted to the jury when "there are disputed issues of material fact" or where "there is room for a difference of opinion"). Accordingly, and where the right to be free from excessive

23

force was clearly established, the Court will deny dismissal or summary judgment based on qualified immunity on this aspect of Campbell's § 1983 claim.

Where the above analysis reflects a genuine issue of material fact as to both aspects of Campbell's § 1983 claim, to the extent that Officer Sims has sought summary judgment on the merits of these claims separate and apart from his qualified immunity claim, the Motion will be denied.

### B.    State Law Claims

As to Campbell's state constitutional claims, Officer Sims's argument for dismissal is that those claims rise or fall with the § 1983 claim in Count 11. Because the Court will deny summary judgment on the § 1983 claims as to Officer Sims in his individual capacity and the John Doe Officers, the Court finds no basis to dismiss Counts 1, 2, or 4, which assert claims under the Maryland Declaration of Rights Articles 24 and 26. *See Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (stating that "[t]he standards for analyzing claims" under Articles 24 and 26 of the Maryland Declaration of Rights "are the same as for analyzing Fourth Amendment claims," so that if the facts support a finding of a violation of the plaintiff's Fourth Amendment rights, "it follows" that the defendant "also violated [the plaintiff's] rights under Articles 24 and 26").

Lastly, Officer Sims asserts, without analysis, that Campbell's remaining state common law tort claims must be dismissed based on the statements of Officer Sims in his affidavit, apparently relying on the arguments asserted as to the § 1983 claim. Because the Court has found that Campbell has stated a viable § 1983 claim even upon consideration of Officer Sims's affidavit, and Officer Sims has offered no other basis for dismissal of the state common law tort claims, the Court will deny Officer Sims's Motion as to Counts 3, 5–8, and 10.

## CONCLUSION

For the reasons set forth above, Takoma Park's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to all claims against Officer Sims in his official capacity and as to the claims against Takoma Park in Counts 3 and 5–12. Because Officer Sims is not sued in his individual capacity on Counts 9 and 12, those claims will be dismissed in their entirety, with Count 12 dismissed without prejudice. The Motion will be denied as to the claims against Takoma Park in Counts 1, 2, and 4. Officer Sims's Motion for Summary Judgment, filed in his individual capacity, will be DENIED.


Date: June 30, 2021

THEODORE D. CHUANG
United States District Judge